**UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION AT DAYTON**

**Yolanda Frederick,**

   *Plaintiff*,

v.                   **Case No. 3:11-cv-288
                       Judge Thomas M. Rose**

**Wal-Mart Inc., et al.,**

   *Defendants*.

**ENTRY AND ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT,** DOC. 37, **AND TERMINATING CASE.**

  Pending before the Court is Defendants' Motion for Summary Judgment. Doc. 37. Plaintiff Yolanda Frederick claims her employment with Defendant Wal-Mart Inc. was wrongfully terminated due to discrimination against because of her gender.  She further claims that she was not re-hired in retaliation for having reported the discrimination against her.  She also claims that Defendants breached its employment policies.

**I.  Background**

  In March 2001, Defendant Wal-Mart Inc. hired Plaintiff Yolanda Frederick. (Frederick Dep. at 45).   She trained at Wal-Mart's Beavercreek store. (Frederick Dep. at 45).   After training, she began as an Assistant Store Manager in Wal-Mart's Trotwood store in July, 2001 (Frederick Dep. at 46).   Plaintiff progressed up the ranks of Wal-Mart from Assistant Manager, to

Co-Manager and eventually Store Manager, back at the Beavercreek store. (Frederick Dep. at 47 – 65).

From December 2007, when she became the Store Manager at Beavercreek, until around September 2008, Plaintiff's employment was uneventful from her perspective. (Frederick Dep. at 179). She testified that "everything was fine" during that period and that she had "no" problems with the team responsible for that market or Defendant Matt O'Halloran, Wal-Mart's manager of the market containing the Wal-Mart Beavercreek store, prior to late September 2008. (Frederick Dep. at 180).  In late September or early October 2008, however, Wal-Mart implemented a new Inventory Management System at the Beavercreek Wal-Mart and other stores. (Frederick Dep. at 129).  The Beavercreek Wal-Mart struggled with the transition to Inventory Management System. The store had trouble managing its inventory, and was neglecting required audits, falling behind in the backroom, and bypassing other Inventory Management System procedures and protocol. (Frederick Dep. at 134-35, 194; Frederick Dep. Ex. 11).

These issues persisted through the fall and winter of 2008 and 2009, and by March 2009, things still had not improved. (O'Halloran Dep. at 71-73).   Furthermore, the Market Team did not believe Frederick was responding well to "opportunities" and criticism. (O'Halloran Dep. at 71-73).  Market Manager O'Halloran explained that Frederick "could not take constructive criticism" and "would get very angry, and would lash out at her manager and hourlies" when she received feedback on the store's Inventory Management System problems. (O'Halloran Dep. at 72-73).

Frederick attributed her store's struggles with the Inventory Management System transition to internal sabotage from Beavercreek Associates who did not like her; and computer interference from nearby Wright Patterson Air Force Base. (Frederick Dep. at 135-137).

As early as 2009, Plaintiff suspected that the hourly associates at the Beavercreek Wal-Mart, and some salaried assistant managers, were intentionally "not binning stuff properly" and "deleting" picks in an effort to undermine Inventory Management System and avoid work. (Frederick Dep. at 137-38).  While Frederick disputes how well the Market Team investigated her suspicions, it is undisputed that she gave them no evidence to corroborate her allegations. (O'Halloran Dep. at 92).  As the Store Manager, Frederick was responsible for managing the associates. (O'Halloran Dep. at 89).  Part of her basic job duties as a Store Manager was to ensure that her associates acted with integrity. (*Id.*; Frederick Dep. Ex. 1).

In addition to claims of internal sabotage, Plaintiff believed that her Store's proximity to Wright Patterson Air Force base resulted in the regular failure of her Store's Telzons, the handheld scanners that associates use to track and scan inventory. (Frederick Dep. at 125, 136).  Plaintiff raised the issue with the Market Team, the claim was investigated, and no link between the Air Force base and electronic issues were discovered, but the Beavercreek Store received new Telzons anyway. (O'Halloran Dep. 46, 158).

As Plaintiff raised allegations of associate sabotage to her Market Team, Plaintiff was telling these same associates that "she believed the [Inventory Management System] system wasn't going to work." (O'Halloran Dep. at 56; Frederick Dep. at 124).  Accordingly, in early March 2009, the Market Team received Open Door complaints concerning Plaintiff from other salaried managers who worked at Beavercreek. (R. Dep. at 64).  These complaints alleged that Plaintiff was not supporting the Inventory Management System and creating confusion and morale problems within the store. (Frederick Dep. at 211).  After speaking with those that worked under Plaintiff, O'Halloran issued Plaintiff a Verbal Coaching for poor business judgment. (Frederick

Dep. Ex. 8; Frederick Dep. at 181).[1] The Coaching provides that Plaintiff "failed to embrace [Inventory Management System] and own the process" and, consequently, this "has created a breakdown with her management team and reduced hourly morale." (Frederick Dep. Ex. 8). The Coaching also states that Plaintiff "will need to communicate problems with Market leadership and avoid venting downward." (Frederick Dep. Ex. 8). In conjunction with this Verbal Coaching, O'Halloran offered Plaintiff additional assistance with the Inventory Management System transition in the spring and summer of 2009.

In May 2009, Inventory Management System Regional Learning Champion Anthony Harvey completed an Inventory Management System Consultation Report at Beavercreek, which included an explanation of the Inventory Management System deficiencies he observed and a "Recommended Plan of Action." (Frederick Dep. at 142; O'Halloran Dep. at 147; Frederick Dep. Ex. 11). Then, in late June 2009, the Market Team directed two other Store Managers in the Market – Ramy Awad and Archie Phillips – to mentor Plaintiff on Inventory Management System implementation. (Frederick Dep. at 142; Frederick Dep. Ex. 12). At the Regional level and Divisional level, Steve Soderfield and Nick Bertram also came to the Store to train Associates and assist with Inventory Management System problems. (Frederick Dep. at 141-143).

Beavercreek's Inventory Management System execution did not improve through the summer of 2009. On a visit to Beavercreek on September 10, 2009, Market Asset Protection Manager Rick Sicotte noted more than a dozen Inventory Management System-related

---

[1] Wal-Mart calls its disciplinary program its "Coaching for Improvement Policy." (Frederick Dep. Ex. 4; Frederick Dep. at 99). The Coaching Policy outlines a progressive disciplinary plan which provides that, in most cases, Associates will receive three Coaching "Steps" before being terminated – a Verbal Coaching, Written Coaching, and Decision-Making Day Coaching. (*Id.*). Each Coaching is active for one year, and the next Coaching Step after the Decision-Making Day results in the associate's termination. (*Id.*). Associates who are terminated after receiving four Coaching Steps in the rolling period are generally terminated for "Misconduct with Coachings" because they have exceeded the allotted Coachings in the rolling period. (P Dep. Ex. 4).

"opportunities." (Frederick Dep. Ex. 15). Consequently, on September 11, 2009, Plaintiff received a Written Coaching for poor job performance and poor business judgment. (Frederick Dep. Ex. 16). The Coaching explains that "Yolanda struggles with understanding the complete processes required for proper execution of [Inventory Management System]" and notes that Plaintiff had displayed poor business judgment by "sharing information with and behaving poorly in front of hourly associates." (Frederick Dep. Ex. 16).

Along with the Written Coaching, Plaintiff received a Performance Improvement Plan. (Frederick Dep. Ex. 17). The Performance Improvement Plan identified four main areas of performance and behavioral concerns and a list of improvement metrics for Plaintiff to accomplish by specific deadlines – deadlines that were selected with Plaintiff's input. (Frederick Dep. Ex. 17; Frederick Dep. at 352). Wal-Mart also asked Plaintiff if she had any interest in stepping down to an Assistant Manager position. (Frederick Dep. at 160-61, 299; O'Halloran Dep. at 77, 121). It was a relatively standard practice in the Market to offer struggling Store Managers who had done well as Assistant Managers an opportunity to return to their old position before they received too many performance-based Coachings. (O'Halloran Dep. at 77, 121). However, Plaintiff refused to step down. (Frederick Dep. at 160; O'Halloran Dep. at 77.)

By the first Performance Improvement Plan deadline was September 25, 2009, Plaintiff had not met the goals. (Frederick Dep. Ex. 19). Thus, on Friday, September 25, 2009, Plaintiff received a Decision-Making Day Coaching. (Frederick Dep. Ex. 19). This Coaching notes that something called the Store's Inventory Management System Swat Team plan was not executed, that bin and sales floor accuracy were not adequate, and that Plaintiff's attitude had not improved. (Frederick Dep. Ex. 19). According to the Coaching for Improvement policy, Plaintiff was to

5

miss a day of work in order to prepare an action plan after receiving a Decision-Making Day Coaching. (Frederick Dep. Ex. 4).

On Monday, September 28, Plaintiff reported back to work, and informed the associates working at the time that she had received a Decision-Making Day Coaching. (Frederick Dep. at 350-59). Plaintiff then told these associates that the back room needed to be rebinned and that she "was going to call legal" because she "felt like she was being conspired against" by associates in the store. (Frederick Dep. at 359).

Plaintiff was scheduled to meet with Monica Reynolds, the Market Human Resources Manager, and O'Halloran, the Market Manager, at 9:00 a.m. on September 28 to discuss her action plan. (Frederick Dep. at 365). However, before their scheduled meeting, Reynolds called Plaintiff and told her not to come in until 3:00 p.m. (Frederick Dep. at 366). The meeting was delayed because of an investigation into hourly associate Joseph Taylor's earlier complaint to the Regional Office that Plaintiff had asked him what he told the Regional Office during an Open Door complaint about her. (O'Halloran Decl. ¶¶4-6).[2] Later that morning, Reynolds and O'Halloran spoke to Beavercreek hourly Associate Joseph Taylor, in response to information they had received about Taylor's Open Door Complaint. (O'Halloran Dep. at 115; see also O'Halloran Dec. ¶¶4-6, attached as Exhibit 1). During the interview with Taylor on September 28, he explained to O'Halloran and Reynolds that Plaintiff had asked him what he told the Regional Office during an Open Door complaint, and stated that he felt "uncomfortable" and pressured to

---

[2] Wal-Mart has an "Open Door Communications Policy" to encourage associates to bring complaints to management. This program assures associates that they are free to use the Open Door Policy without fear of retaliation or management interference. (P. Dep. Ex. 5). Confidentiality and non-retaliation are the cornerstones of the Open Door process.

6

answer because he "was already in hot water for my attendance." (Frederick Dep. at 394; O'Halloran Dep. at 77-78; O'Halloran Dec. ¶¶4-6).

When Plaintiff returned to the Market Office around 3:00 p.m., she was brought in to talk with O'Halloran and Reynolds, asked several questions, and then asked to write a written statement about what was discussed. (O'Halloran Dep. at 77-80). After reviewing the statement and speaking to Plaintiff, O'Halloran concluded that Plaintiff had violated the Open Door Policy by asking Taylor about his Open Door complaint and thereby violating the confidentiality of the process. (O'Halloran Dep. at 77-80; O'Halloran Decl. ¶6). Since she had already been given a Decision Day, the next step in the disciplinary process was termination. (Frederick Dep. Ex. 4). Thus, O'Halloran informed Plaintiff that she was being terminated, and Wal-Mart processed her termination for Misconduct with Coachings. (Frederick Dep. Ex. 22).

Plaintiff admits that on September 22, 2009, she approached Taylor, informed him that she was about "a month away" from "getting fired" and wanted to know exactly what "I'm doing wrong." (Frederick Dep. at 416). She then asked Taylor what problems he had with her and asked him "what exactly did you tell the regional office? (Frederick Dep. at 416). Plaintiff admits that this was "not an appropriate question" to ask Taylor. (Frederick Dep. at 417).

Between September 20, 2009 and November 2, 2009, Plaintiff sent a number of letters to the Regional Office covering the Beavercreek Wal-Mart and Wal-Mart's Home Office. On September 29, 2009, the day after Plaintiff was terminated, she submitted a letter entitled "Open Door 3" to the Regional Office. In this letter, Plaintiff alleges that she feels she has been the victim of discrimination. (Frederick Dep. Ex. 23). Upon receiving Plaintiff's "Open Door" letters, then Regional Human Resources Manager Ali Naghdi called Plaintiff and informed her that Company would investigate her claims. (Frederick Dep. at 335). Naghdi called the Plaintiff

7

again on October 14th, and the two spoke again on October 18th and the week of October 29th. (Frederick Dep. at 470-475).

On October 26, 2009, Plaintiff sent a final letter entitled "Open Door" to Wal-Mart's Home Office. (Frederick Dep. Ex. 25). In this correspondence, Plaintiff protests the amount of time it took Naghdi to respond to her, alleges that she was "retaliated against" by O'Halloran, and asks to be reinstated. (Frederick Dep. Ex. 25). On November 12, Plaintiff received a telephone call from HR Vice President Anne Thomas in Wal-Mart's Home Office informing her that her allegations were being investigated. (Frederick Dep. at 371). At Thomas' request, Plaintiff sent Thomas an email on November 16, detailing her concerns, and Thomas investigated her allegations, spoke with relevant parties – none of whom believed that Plaintiff had been subjected to any discriminatory or retaliatory treatment – and concluded that the Plaintiff had not been wrongfully terminated. (See the declaration of Anne Thomas ¶¶ 3-8, attached as Exhibit 2). On November 20, 2009, Thomas informed Plaintiff that her termination was being upheld by the Company, and that she would not be reinstated. (*Id.*).

Frederick filed complaints with the Ohio Equal Rights Commission and the U.S. Equal Employment Opportunity Commission asserting gender discrimination and retaliation. Doc. 1, ex. A. The E.E.O.C. issued a right to sue letter on May 12, 2011. *Id.*

On August 12, 2011 Frederick filed an action in this Court asserting claims of discrimination in violation of Title VII and Ohio Revised Code Title 41, Gender Discrimination in Violation of Title VII and Ohio Revised Code §§ 4112.02 and 4112.99, Retaliation in violation of Title VII and Ohio law, including wrongful termination, and "Breach of Defendants' Custom, Practices or Policies and/or Engaging in Contrary Policies Violating Equal Employment

8

Opportunities." The Complaint names as defendants Wal-Mart and Market Manager Matthew O'Halloran.

Defendants filed a motion for summary judgment on all claims. Doc. 37. Plaintiff filed a response only contesting whether summary judgment should be entered on Plaintiff's gender discrimination claims. Doc. 44. Defendants have replied, doc. 45, rendering the matter ripe for decision.

## II.     Summary Judgment Standard

The standard of review applicable to motions for summary judgment is established by Federal Rule of Civil Procedure 56 and associated case law. Rule 56 provides that summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). Alternatively, summary judgment is denied "[i]f there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Hancock v. Dodson*, 958 F.2d 1367, 1374 (6th Cir. 1992) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986)). Thus, summary judgment must be entered "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

The party seeking summary judgment has the initial burden of informing the court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, admissions and affidavits which it believes demonstrate the absence of a genuine issue of material fact. *Id.*, at 323. The burden then shifts to the nonmoving party who "must set

forth specific facts showing that there is a genuine issue for trial." *Anderson*, 477 U.S., at 250 (quoting Fed. R. Civ. P. 56(e)).

Once the burden of production has shifted, the party opposing summary judgment cannot rest on its pleadings or merely reassert its previous allegations. It is not sufficient to "simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). Rule 56 "requires the nonmoving party to go beyond the pleadings" and present some type of evidentiary material in support of its position. *Celotex Corp.*, 477 U.S., at 324.

In determining whether a genuine issue of material fact exists, a court must assume as true the evidence of the nonmoving party and draw all reasonable inferences in the favor of that party. *Anderson*, 477 U.S., at 255. If the parties present conflicting evidence, a court may not decide which evidence to believe by determining which parties' affiants are more credible. 10A Wright & Miller, *Federal Practice and Procedure*, § 2726. Rather, credibility determinations must be left to the fact-finder. *Id*.

Finally, in ruling on a motion for summary judgment, "[a] district court is not…obligated to wade through and search the entire record for some specific facts that might support the nonmoving party's claim." *InterRoyal Corp. v. Sponseller*, 889 F.2d 108, 111 (6th Cir. 1989). Thus, in determining whether a genuine issue of material fact exists on a particular issue, the court is entitled to rely upon the Rule 56 evidence specifically called to its attention by the parties.

In addition to moving for summary judgment on Plaintiff's federal claim, Defendant is seeking summary judgment on Defendant's claim brought under Ohio law. In reviewing a claim under Ohio law, this Court must interpret Ohio law consistent with the interpretations of the Supreme Court of Ohio. *Northland Ins. Co. v. Guardsman Prods. Inc*., 141 F.3d 612, 617 (6th Cir.

1998). Specifically, this Court must apply the substantive law of Ohio "'in accordance with the then-controlling decision of the highest court of the State.'" *Imperial Hotels Corp. v. Dore*, 257 F.3d 615, 620 (6th Cir. 2001) (quoting *Pedigo v. UNUM Life Ins. Co.*, 145 F.3d 804, 808 (6th Cir. 1998). Also, to the extent that the highest court in Ohio has not addressed the issue presented, this Court must anticipate how Ohio's highest court would rule. *Id.* (quoting *Bailey Farms, Inc. v. NOR-AM Chem. Co.*, 27 F.3d 188, 191 (6th Cir. 1994)).

**III.    Analysis**

**A.    Gender Discrimination Claims**

"The Ohio Supreme Court has held that the analysis used to evaluate claims under § 4112.02 is identical to the analysis used for Title VII." *Conley v. City of Findlay*, 266 Fed. App'x. 400, 404 (6th Cir. 2008) (citing *Little Forest Med. Ctr. of Akron v. Ohio Civil Rights Comm'n*, 575 N.E.2d 1164, 1167 (Ohio 1991)); *Majewski v. Automatic Data Processing, Inc.*, 274 F.3d 1106, 1117 (6th Cir. 2001)("Ohio courts examine state employment discrimination claims in accordance with federal case law interpreting Title VII."). Courts can review claims under Ohio Revised Code § 4112 together with Title VII claims, as they are subject to the same evidentiary standards. See, e.g., *Lentz v. City of Cleveland*, 333 Fed. App'x. 42, 45 (6th Cir. 2009)("the familiar *McDonnell Douglas* framework guides [Plaintiff's] discrimination claims under federal and Ohio law."); Thus, the Court considers these claims together.

When, as here, a plaintiff lacks direct evidence of retaliation, a plaintiff may utilize the burden shifting analysis set forth in *McDonnell Douglas* to avoid summary judgment. See *McDonnell Douglas v. Green*, 411 U.S. 792 (1973).

> First, the plaintiff has the burden of proving by the preponderance of the evidence a prima facie case of discrimination. Second, if the plaintiff succeeds in proving the prima facie case, the burden shifts

11

> to the defendant "to articulate some legitimate, nondiscriminatory reason for the employee's rejection." Third, should the defendant carry this burden, the plaintiff must then have an opportunity to prove by a preponderance of the evidence that the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination.

*Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 252-53 (1981) (citing *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802, 804 (1973). In order to prove a prima facie case of disparate treatment under Title VII based upon indirect evidence, a plaintiff must prove that: (1) she is a member of a protected class; (2) she was qualified for the job; (3) an adverse employment action was taken against her; and (4) she was replaced by someone outside the protected class, or treated differently than similarly situated non-protected employees. *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973); see also *Warfield v. Lebanon Correctional Inst.,* 181 F.3d 723, 728 (6th Cir. 1999). In order to prove the alternative basis of the fourth element, a plaintiff must produce evidence that the "relevant other employees are 'similarly situated in all respects.'" See *Hollins v. Atlantic Co.*, 188 F.3d 652, 659 ((6th Cir. 1999) (quoting *Mitchell v. Toledo Hosp.*, 964 F.2d 577, 583 (6th Cir. 1992)).

Once the plaintiff establishes the prima facie case, the employer must meet its burden of production to establish a legitimate, nondiscriminatory reason for the plaintiff's discharge or denial of promotion. See *Texas Department of Comm. Affs. v. Burdine*, 450 U.S. 248, 253 (1981); *McDonnell Douglas*, 411 U.S., at 802. The burden of production then shifts back to the plaintiff to show by a preponderance of the evidence that the employer's legitimate reasons are merely pretexts for discrimination. See *McDonnell Douglas*, 411 U.S., at 802. The plaintiff may establish pretext by showing that the employer's proffered explanation is false or unworthy of credence. *Reeves v. Sanderson Plumbing Prods., Inc*., 530 U.S. 133 (2000).

In the instant case, Defendants assert that Plaintiff cannot establish that a similarly situated employee who was not a member of Plaintiff's protected class was treated more favorably, and that Plaintiff cannot establish that the proffered reason for Plaintiff's dismissal was pretextual. Attempting to establish the first of these two elements, Plaintiff writes:

> Plaintiff was on her D-Day (see *Texas Dept. of Community Affairs v. Burdine*, 450 U.S. 248 (1981), *Mitchell v. Toledo Hospital*, 964 F.2d 577 (6th Cir. 1992). But she was not allowed to take a demotion (see *Faragher v. City of Boca Raton¸*118 S. Ct. 2275 (1998), *Niswander v. Cincinnati Ins. Co.*, 529 F.3d 714 (6th Cir. 2008). Brooks Rutledge was allowed to be demoted (Def. Discovery Doc. Ex. ZZ). The coaching of Rutledge showed he was allowed to take a demotion. Frederick was not.

Doc. 44 at 16-17. A fatal problem for Plaintiff's position, as Defendants adroitly point out, is that it is not true. Plaintiff admits that two Wal-Mart employees suggested that she step down to an assistant manager position, the first being Archie Phillips:

> [H]e asked me, he says—asked me if I wanted to step down. And he asked me could I afford to step down financially because I had just bought a house. Asked me if I could step down and he would take me as one of his co's or one of his assistants.

Frederick Dep. at 160-61. Later Rick Sicotte repeated the offer:

> Q: during that meeting or that store visit on 9-11-2009, was there a discussion with Sicotte about you stepping down to a co-manager position?
>
> A: We had talked. And he looked at me and he says, you know, Yolanda, he says, honestly, if David Gose was to come in—and he led me to believe that David Gose would be there on Friday along with Matt. That was a scare tactic, I believe. He says, you might want to think about stepping down. Now, Archie Phillips in July—
>
> Q: I just want to know about your conversation with Rick.
>
> A: Okay.

> Q: Okay. So he had said to you that you might want to think about stepping down?
>
> A: Yes.
>
> Q: What did—did you have any response to that?
>
> A: I didn't say anything to him. It was midday. I went to—well, it was midday. I really didn't have a response. I wasn't going to step down. I knew at that moment that, you know, I wasn't going to step down.

Frederick Dep. at 299-300. Given Plaintiff's admission that she was given the same treatment as the non-protected class member she claims was treated more favorably, the Court need not consider whether Defendant's asserted non-discriminatory reason for terminating Plaintiff—that she had accrued four disciplinary actions in a twelve-month period—was pretextual.

**IV. Conclusion**

Because Plaintiff has no direct evidence that she was terminated from her employment because of her gender and because she cannot establish that a similarly situated non-member of her protected class was treated more favorably, summary judgment on Plaintiff's claims of gender discrimination will be granted to Defendants. Because Plaintiff has not opposed the motion for summary judgment on Plaintiff's other claims, summary judgment will be awarded to Defendants on these claims as well. Thus, Defendants' Motion for Summary Judgment, doc. 37, is **GRANTED** and the instant case is **TERMINATED** on the docket of the United States District Court for the Southern District of Ohio at Dayton.

**DONE** and **ORDERED** in Dayton, Ohio, this Monday, November 4, 2013.

                                                s/Thomas M. Rose
                                    _____
                                              THOMAS M. ROSE
                                  UNITED STATES DISTRICT JUDGE